Marc P. Berger
Sanjay Wadhwa
Gerald A. Gross
Jack Kaufman
Liora Sukhatme
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0106 (Kaufman)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,  :
                                     :   **COMPLAINT**
                                     :
                         Plaintiff,  :   19 Civ. ( )
                                     :
        -against-                    :   ECF CASE
                                     :
JERRY LI,                            :   JURY TRIAL DEMANDED
                                     :
                         Defendant.  :
------------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Jerry Li ("Li" or the "Defendant"), alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1.      This action arises from violations of the Foreign Corrupt Practices Act of 1977 ("FCPA") by defendant Li, the former Managing Director of a direct selling company in China ("China Subsidiary"), which is made up of wholly owned subsidiaries of a U.S. based direct selling company ("Company A").

1

2. From 2006 to 2016, Li orchestrated a bribery scheme in China, bribing local, provincial, and national government officials to obtain direct selling licenses and curtail government investigations of China Subsidiary's business practices.

3. As China Subsidiary's Director of Sales in 2006 and 2007, and as its Managing Director from December 2007 until 2016, Li directed a scheme to: (i) bribe officials through payments of cash, gifts, travel, meals, and entertainment; (ii) falsify expense reports for those payments; and (iii) circumvent Company A's internal accounting controls to conceal the bribes.

## **VIOLATIONS**

4. By virtue of the conduct alleged in this Complaint, Defendant has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices and courses of business that constitute violations of Sections 13(b)(2)(A), 13(b)(2)(B), 13(b)(5) and 30A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B), 78m(b)(5) and 78dd-l] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1].

5. Unless the Defendant is permanently restrained and enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object. Defendant should also be ordered to pay appropriate civil monetary penalties.

## **NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

6. The Commission brings this action pursuant to authority conferred by Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)].

7. The Commission seeks a final judgment: (a) permanently enjoining the Defendant from future violations of the securities laws provisions that the Defendant violated as alleged in this Complaint; (b) imposing civil money penalties on the Defendant pursuant to

Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and (c) such other relief as the Court deems just and appropriate.

## JURISDICTION AND VENUE

8. This court has subject matter jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e) and 78aa].

9. Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the Southern District of New York.  Among other things, the Defendant gave false testimony to the Commission in the Southern District of New York, in the presence of an officer and other representatives of Company A, concerning the violations described herein.

10. The Defendant, directly or indirectly, made use of the means or instrumentality of interstate commerce in connection with the transactions, acts, practices and courses of business alleged in this Complaint, including travel, the mails, telephonic communications, and electronic messaging.  Among other things, Defendant communicated telephonically and via email with officers and employees of Company A in the United States regarding obtaining approvals for entertaining of Chinese media and Government officials that the Defendant used to bribe the officials.  The Defendant also emailed false internal certifications to Company A management in connection with Company A's Commission filings in the United States, as described in paragraph 35 of this Complaint.

## DEFENDANT

11. **Li**, age 51, is a Chinese national residing in China and was the Managing Director of China Subsidiary from December 2007 to May 2017.  Prior to becoming Managing Director, Li was the Director of Sales for China Subsidiary in 2006 and 2007.

## RELEVANT ENTITIES AND INDIVDUALS

12. **"Company A"** is a direct selling company incorporated in the Cayman Islands with headquarters in the United States. Company A's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act. At all relevant times, its stock has been listed on the New York Stock Exchange, and it has been an "issuer" within the meaning of the FCPA.

13. **"China Subsidiary"** is a group of wholly-owned, China-based subsidiaries of Company A.

14. **"China Employee 1"** is a Chinese national who resides in China. From 2006 to May 2017, China Employee 1 served as the head of the External Affairs department ("External Affairs") for China Subsidiary. China Employee 1 reported directly to Li from December 2007 to May 2017.

15. **"China Employee 2"** is a Chinese national who resides in China. From at least 2007 to at least 2008, China Employee 2 was a sales manager at China Subsidiary. From at least December 2007, China Employee 2 reported to Li.

16. **"China Employee 3"** is a Chinese national who resides in China. From at least 2007 to 2017, China Employee 3 was a senior manager in External Affairs and reported directly to China Employee 1.

17. **"China Employee 4"** is a Chinese national who resides in China. From at least 2007 to 2017, China Employee 4 was the head of Finance for China Subsidiary. At all relevant times, China Employee 4 reported directly to Company A's Asia regional management, and indirectly to Li.

# FACTS

18.     Since at least 2006, External Affairs, headed by China Employee 1, was responsible for obtaining direct selling licenses from the Chinese government – a prerequisite for China Subsidiary to conduct its direct selling business in China. External Affairs was also responsible for promoting China Subsidiary's interests to the Chinese government, responding to inquiries and investigative requests from the Chinese government, and marketing China Subsidiary through the Chinese media. In 2007, External Affairs was comprised of 3-4 employees, but it grew to approximately 100 employees by 2016.

**A.     Li Bribed Chinese Government Officials
        to Obtain Licenses and Stop Government Investigations**

19.     In late 2006, China Subsidiary submitted an application to the Chinese government for its first direct selling license in China. To facilitate application approval, China Subsidiary paid bribes to government officials employed by the China Ministry of Commerce (the agency responsible for awarding direct selling licenses in China), and to local offices of the China State Administration for Industry and Commerce (another government agency that participated in the licensing process). Li and China Employee 1 directed the payment of those bribes. For example, in a January 10, 2007 recorded telephone call, Li asked China Employee 1 whether China Subsidiary had "taken care of" an official at the Ministry of Commerce ("Official 1"). Li then asked, "We have given the money to [Official 1], haven't we?" to which China Employee 1 replied, "Of course we have." Li stated, "The money works well on him."[1]

20.     Li also directed the payment of bribes to Chinese government officials to stop government investigations of China Subsidiary, and to prevent or reduce fines issued to China

---

[1] The telephone discussions described in this Complaint were in Chinese, and the quoted excerpts are English translations of those recordings.

Subsidiary by the Chinese government. For example, in a March 15, 2007 recorded telephone call, Li and China Employee 1 discussed such payments to officials in Jilin Province. Li told China Employee 1 that Li had paid 35,000 yuan (approximately $4,500) to officials in Jilin "to build the connection…I was thinking it is better to spend money beforehand than spending money afterwards. This money is a small sum after all, and if we were to be penalized, the figure will be much greater."

21. In a December 5, 2007 recorded telephone call, Li and China Employee 1 discussed payments made by China Employee 2 to officials in Zhejiang province to stop several government investigations of China Subsidiary. Li told China Employee 1 that Li had told China Employee 2 "to handle those needed to be done immediately. As for how much we should give to those from district bureau, I told him to talk to you first." China Employee 1 responded that she had already discussed this issue with China Employee 2, and that "we already handled everything before I left yesterday, and he even bought cards…If they dare to take our money, then they should get this handled for us."

22. After China Subsidiary obtained its first direct selling license from the Chinese government, Li continued to bribe government officials to secure additional licenses. For example, in a September 8, 2009 recorded telephone call, Li spoke with an official from the State Administration for Industry and Commerce in Shaanxi Province ("Official 2"). Official 2 told Li that there may be "some trouble" in Beijing, and that China Subsidiary may have to pay a fine. Official 2 told Li that he did not "want to discuss too much with you over the phone," but that he was interested in becoming a "consultant" to China Subsidiary, and that this money would help pay for his "son's house purchasing fund." Official 2 also told Li that China Subsidiary's licensing process in Shaanxi Province was almost complete, and Li thanked him: "You have

certainly helped us to get this done." Official 2 told Li that he will go to "Beijing to visit the leadership, because not only for taking care of this matter, it is the relationship for life."

**B.  Li Bribed Chinese State-Owned Media
to Prevent Negative Media Coverage of China Subsidiary**

23. Li also bribed government officials at state-owned media outlets in China[2] to prevent negative media coverage of China Subsidiary. For example, in January 2013, a state-owned media outlet ("Media Outlet 1") published a negative article about China Subsidiary. In an April 22, 2013 recorded telephone call, China Employee 1 told Li that she had met with the President of Media Outlet 1 ("Media Official 1") and asked him to remove the negative article. China Employee 1 told Li: "He already took what he should take, ate what he should eat, drank what he should drink, and used what he should use. It's up to him." Li responded: "It is time for him to get to work, right?" China Employee 1 told Li that she told Media Official 1 that "if you destroyed us, where could you get money?" to which Media Official 1 laughed and agreed to remove the negative articles. Li praised China Employee 1: "You have done a great job!"

24. In 2013, another state-owned media outlet ("Media Outlet 2") published several negative articles about China Subsidiary. In an August 28, 2013 recorded telephone call, China Employee 3 told Li that he had met with the Chief Editor of Media Outlet 2, who "had agreed that they would stop after publishing two articles and we would start to negotiate collaboration." China Employee 3 told Li that when the Chief Editor of Media Outlet 2 escorted him out, China Employee 3 "put our 'goodwill' on the desk. He pretended he did not see it. This should not be a problem." Li told China Employee 3 that they should ask Media Outlet 2 to publish positive articles before negotiating "collaboration."

---

[2] Employees of state-owned media outlets in China are "foreign officials" under the FCPA.

C.       **Li Approved False Expenses and Deceived Internal Auditors at China Subsidiary**

25.     From at least 2006 to at least October 2016, Li approved reimbursement applications for purportedly legitimate business expenses billed to China Subsidiary that, in fact, were false, and that Li knew were false at the time he approved them.  For example, in a December 30, 2006 recorded telephone call, Li and China Employee 1 discussed China Subsidiary expense reports that had been submitted for bribes paid to local officials in Jiangxi Province.  China Employee 1 told Li that Li had signed expense reports listing "red envelopes" given to certain government officials.  Li told China Employee 1 that he had not noticed that the expense reports listed "red envelopes" and asked China Employee 1 to send the expense reports back to the employee who had submitted them and ask that employee "to rewrite the form," thereby concealing the nature of payments.  In the context of this conversation, Li understood that "red envelope" meant a cash bribe.

26.     In a September 1, 2010 recorded telephone call, Li and China Employee 4 discussed giving advance warning to and coaching an External Affairs employee for an investigation by the China Subsidiary's internal audit department ("IA").  An IA manager had learned that the External Affairs employee had submitted a fake hotel receipt, and the IA manager told Li and China Employee 4 that the IA manager intended to confront the External Affairs employee about the fake receipt.  Li told China Employee 4 to warn the External Affairs employee but to avoid using company email when doing so.  Li also told China Employee 4 to coach the External Affairs employee to stick to his false story:  "No matter what will happen to him, he should tell them it came from the hotel.  If he gives in, then we will fall like a landslide…He should just tell them that he was given a wrong receipt."

27. In a January 9, 2012 recorded telephone call, Li and China Employee 1 discussed other fake receipts that had been identified by IA, in this case phony restaurant receipts. Li told China Employee 1 that she should try to get reissued receipts from the restaurants to avoid further investigation. Later that day, China Employee 1 told an External Affairs colleague that Li was worried about "what's going on between us and [Company A], especially the [Company A] auditing department…Jerry [Li] is afraid something may go wrong." China Employee 1 also said that Li did not want China Employee 1 to go to the IA committee meeting, and that Li would "deal with them on [China Employee 1's] behalf."

28. In 2015 and 2016, Li approved several expense applications submitted by an External Affairs employee for reimbursement of approximately $150,000 paid to a farm in Yantai, purportedly for shipping fruit and vegetable gifts to Chinese government officials. The amount of produce purportedly purchased at the farm would have weighed approximately 34.5 metric tons, or 135 pounds per purported gift recipient and, thus, could not have been the actual purpose of the $150,000 expenditure. Li knew that these expense applications and the attached invoices were false and had been created for an illicit purpose.

29. China Subsidiary's financial statements were consolidated into Company A's reported financial statements, which were filed in the United States. Therefore, the false expenses approved and facilitated by Li were incorporated into Company A's financial statements.

D. **Li Misled IA Concerning Unreasonable Spending and Internal Policy Violations**

30. Between 2012 and 2016, Li falsely assured IA that certain high, illicit External Affairs expenses were legitimate and necessary business expenses. Li also falsely assured IA

9

that he was otherwise committed to improving compliance of Company A's internal FCPA and internal accounting controls.

31. IA audited External Affairs' expenses approximately twice a year, and IA issued a report ("EA Audit Report") at the conclusion of each audit. The EA Audit Reports showed unreasonably large expenses and listed violations of China Subsidiary's policies, including fake receipts and verbal approval of expenses.

32. For example, in 2014, Li received an EA Audit Report that found that, during one six-month period, China Employee 1 had spent over $1 million on restaurant meals with Chinese government officials. According to the report, China Employee 1 had attended 239 such meals, with a total of 4,312 participants, thus averaging $3,232 per meal. These numbers were implausibly high, as there were only 184 days (including weekends) during those six months. According to the EA Audit Report, during those six months, External Affairs treated 30,076 Chinese government officials to meals and spent a total of approximately $3.7 million for meals, gifts, and entertainment of government officials.

33. In April 2016, Li received another EA Audit Report covering expenses for the first six months of 2015. The report stated that China Employee 1 had attended 115 restaurant meals with Government officials during a single six-month period. The average cost per meal was $1,472, which was implausible on its face. During that same period, according to the EA Audit Report, China Employee 1 provided gifts to 828 government officials, totaling $146,485. The report stated that "vendor receipts were replaced when problems were found," highlighting China Subsidiary's practice of allowing External Affairs to replace problematic receipts, and failing to highlight those problems on the final reports. Despite this practice of replacing problematic receipts, the report still found violations, such as restaurant receipts submitted by

different employees with very close transaction times in the same restaurant. The report also found that External Affairs had expended a total of $811,465 without corporate approvals, and that seven External Affairs employees (including China Employee 1) had relied solely upon verbal approvals for more than 50% of their expense applications, despite China Subsidiary's internal policy that such verbal approval could be used only for emergency expenditures.

34.     Li received copies of the above-described EA Audit Reports in advance of their distribution to Company A executives and board members in the U.S. After Li received the EA Audit Reports, he discussed the findings with IA. Li falsely assured IA that the abnormally high EA expenses were legitimate and necessary to conduct business in China. Li acknowledged the compliance problems identified in the reports, such as the use of fake receipts, and falsely assured IA that he would discipline and train employees to improve compliance of China Subsidiary's policies. IA purported to rely on Li's false assurances in sending the EA Audit Reports (including Li's assurances) to Company A's management and its Board of Directors, and in responding to the Board of Directors' subsequent inquiries regarding the high EA spending.

**E.    Li Provided False Internal Certifications
        and Made False Statements to Company A Management**

35.     As Managing Director of China Subsidiary, for each quarter from 2008 to 2016, Li signed an internal certification related to Company A's filings. In each instance, Li certified: (i) "I designed disclosure controls and procedures (meaning controls and other procedures for recording, processing, summarizing, and reporting information that [Company A] must disclose in its public report) to ensure that material information relating to my area of responsibility is made known to the CEO and CFO"; (ii) "nothing came to my attention that made me question the effectiveness of [Company A's] disclosure controls and procedures"; and (iii) "I am not aware of any significant deficiencies in the design or operation of [Company A's] internal

controls or any material weaknesses in internal controls or any fraud, whether material or not material, that involves management or other employees who have a significant role in [Company A's] internal controls." Based on the facts summarized above, showing Li's concealment of bribery, approval of false expenses, and circumvention of internal accounting controls, these certifications were false.

36. On October 20-21, 2016, in testimony before the Commission staff – and in the presence of the Company A officer responsible for its FCPA compliance (and other Company A representatives) – Li denied knowledge of any payments to Chinese government officials on behalf of China Subsidiary. Specifically, Li stated that he never offered any payment to any official at the Ministry of Commerce or the State Administration of Industry and Commerce, and that he was not aware of any such payments offered by anyone at China Subsidiary. Li also stated that China Subsidiary was very strict about FCPA compliance. Those statements were false and misleading, for the reasons set forth above, and Li thus further acted to circumvent Company A's internal accounting controls. Lee further testified that he did not have a personal email account and that he did not use any email account other than his work email. This testimony was false and misleading because Li did, in fact, have a personal email account, which he used for work-related correspondence.

## FIRST CLAIM FOR RELIEF

## Violations of Section 30(A) of the Exchange Act

### (Anti-Bribery Provisions of the FCPA)

37. Paragraphs 1 through 36 are re-alleged and incorporated by reference herein.

38. Li, who was an officer, director, employee, or agent of Company A, a U.S. issuer, made use of the mails or other means or instrumentalities of interstate commerce corruptly in

furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to foreign officials for the purposes of influencing their acts or decisions, securing an improper advantage, or inducing them to use their influence to assist the issuer in obtaining or retaining business.

39. By reason of the foregoing, Li violated Section 30A of the Exchange Act [15 U.S.C. §78dd-l].

## SECOND CLAIM FOR RELIEF

### Li Aided and Abetted Company A's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

**(Company Books and Records and Internal Accounting Controls)**

40. Paragraphs 1 through 36 are re-alleged and incorporated herein by reference.

41. Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets.

42. Section 13(b)((2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B) requires issuers to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to allow preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

43. Company A violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B)].

44. Li knowingly or recklessly provided substantial assistance to Company A with respect to Company A's violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B)].

45. By reason of the foregoing, Li violated Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] by aiding and abetting Company A's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B)].

## THIRD CLAIM FOR RELIEF

### Li Violated Section 13(b)(5) of the Exchange Act and Exchange Act Rule 13b2-1

### (Falsifying Books and Records)

46. Paragraphs 1 through 36 are re-alleged and incorporated herein by reference.

47. As described above, Li knowingly falsified, and directly or indirectly caused to be falsified books, records, or accounts of Company A, an issuer subject to Section 13(b)(2) of the Exchange Act [15 U.S.C. §78m(b)(2)]. As a result of Li's conduct, the books and records of Company A falsely recorded the corrupt payments for bribes to Chinese government officials described above as payments for *bona fide* business expenses. By authorizing the falsification of invoices and expense applications, Li knowingly circumvented Company A's internal accounting controls.

48. By reason of the foregoing, Li violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. §240.13b2-1].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Finding that the Defendant (A) violated Sections 13(b)(5) and 30A of the Exchange Act [15 U.S.C. §§ 78m(b)(5) and 78dd-l] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1]; and (B) aided and abetted Company A's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the

Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B)] as alleged in this Complaint;

## II.

Permanently enjoining the Defendant, his agents, servants, employees, attorneys-in-fact and assigns, and those persons in active concert or participation with him or who receive actual notice of the injunction by personal service or otherwise, from (A) violating or aiding and abetting violations of Sections 13(b)(5) and 30A of the Exchange Act [15 U.S.C. §§ 78m(b)(5) and 78dd-l] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1]; and (B) aiding and abetting violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B)];

## III.

Ordering the Defendant to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## IV.

Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:     New York, New York
           November 14, 2019

By: _____
    Marc P. Berger
    Sanjay Wadhwa
    Gerald A. Gross
    Jack Kaufman
    Liora Sukhatme
    Attorneys for Plaintiff
    SECURITIES AND EXCHANGE COMMISSION
    New York Regional Office
    Brookfield Place
    200 Vesey Street, Suite 400
    New York, New York 10281-1022
    (212) 336-0106 (Kaufman)
    Kaufmanja@sec.gov